**Howard CLIBURN, Administrator of the Estate of Henry Malcolm Cliburn, Deceased, Appellant,**

v.

**JETT DRILLING COMPANY, Appellee.**

**No. 20162.**

United States Court of Appeals
Fifth Circuit.

June 7, 1963.

Francis S. Bowling, Crisler, Crisler & Bowling, Jackson, Miss., George B.

Grubbs, Mendenhall, Miss., J. P. Patterson, Monticello, Miss., for appellant.

William E. Suddath, Jr., Jackson, Miss., Watkins & Eager, Jackson, Miss., of counsel, for appellee.

Before PHILLIPS,* WISDOM and GEWIN, Circuit Judges.

PHILLIPS, Circuit Judge.

The administrator of the estate of Henry Malcolm Cliburn, deceased,[1] filed an action in the Chancery Court of Simpson County, Mississippi, against Jett Drilling Company, Inc.[2] to recover damages for the wrongful death of Cliburn. The action was duly removed to the United States District Court for the Southern District of Mississippi and trial was had to a court and jury. At the conclusion of the administrator's case, the court sustained Jett's motion for a directed verdict in its favor and judgment was entered accordingly. The administrator has appealed.

The evidence presented at the trial, considered in the light most favorable to the administrator, provided substantial proof of the following facts:

In February, 1961, Cliburn was employed as a derrick man by Graham Brothers Company.[3] Graham was engaged in the business of working over completed oil wells. On Friday, February 10, 1961, Mr. Garrett, the local production superintendent for Jett in Citronelle, Alabama, contacted W. D. Beaty, Graham's tool pusher, in regard to working over a Jett well, located about three miles from Citronelle. At 11 a. m. of that day, Garrett and Beaty drove to the site where the well to be worked over was located. Garrett asked Beaty if he could get the Graham rig on the site that day, since Alabama law prohibited moving the rig on the highway on Saturday, and Beaty responded that he thought he could move the rig in, but that Graham's marsh anchors were installed in the

ground at another well about five miles distant from where the rig was located, that such anchors would be needed before Beaty and his crew could install the rig and that it would take about three hours to get them. Garrett answered that it would be unnecessary to get Graham's marsh anchors, since Jett had permanent dead men installed at the well site, which Beaty and his crew could use. Garrett pointed out such dead men to Beaty at the well site and told Beaty that he wanted the rig rigged up and to go ahead and tie onto Jett's dead men, because it would save time. Garrett not only offered the use of Jett's dead men to Beaty, but insisted that he use them. Beaty asked Garrett how long the dead men had been there and Garrett replied "five or six months. They are perfectly good dead men." Beaty then replied he would use Jett's dead men. Beaty relied on Garrett's assurance that the dead men were in good condition. Beaty agreed to perform the overhaul job for a fee of $250 for moving the rig onto the location and an hourly charge of $23 for performing the overhaul.

A marsh anchor is a device with a bit on one end and an eye on the other. It is screwed into the ground to a depth of six feet and a guy wire from the derrick is attached to the eye to give support to the derrick. One anchor and guy wire is used at each of the four corners of the well. Dead men are permanently installed anchors used for the same purpose. A dead man is a piece of pipe with a cable attached to its center with a half hitch. The upper end of the cable has a loop. The pipe is placed in a hole two feet wide, six feet long and five or six feet deep and is embedded in concrete and covered over with dirt. After a dead man is installed, only the upper portion and a loop of the cable are above the ground.

Graham's rig was moved to the site of the Jett well late on Friday, February

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called Cliburn.

2. Hereinafter called Jett.

3. Hereinafter called Graham.

10, 1961, and Beaty and his crew commenced to rig up the following morning. Garrett was present. At approximately noon, guy wires at each of the four corners of the Graham derrick were attached to Jett dead men. At approximately 1 p. m., Graham's crew began disassembling the well equipment and removing the packer and tubing from the well. The tubing was removed in two joint sections approximately 60 feet in length and placed in a pipe rack on the derrick. At 4 p. m., the crew was changed, but Cliburn remained on duty as derrick man. H. R. Jordan replaced Beaty at 4 p. m. About 8.30 p. m., Beaty went to sleep in a pickup truck on the well site. At 9:47 p. m., Jordan, while sitting on the right side of the rig, looked up and saw the derrick was moving. He turned and saw that the right rear dead man had pulled out and was dragging on the ground. Cliburn, the derrick man, was on the derrick, approximately 55 feet in the air, tied to the derrick with a safety belt. The derrick fell to the ground and Cliburn was killed. Beaty assigned two watchmen to stay with the rig that night and the following morning he and Jordan returned to examine the equipment and premises. Such examination disclosed that the dead man on the right rear had pulled completely out of the ground; that its cable was attached to the pipe at one end, rather than at the center, and that the pipe had been installed only 12 inches below the surface of the ground and had not been set in concrete. The cable on the right front dead man had pulled out of the ground without pulling any pipe with it. No investigation was made as to the manner in which the latter dead man had been installed.

The dead men had been installed by Jett on May 27, 1960, to provide support for its work over rig. They were used by Jett for that purpose for four days and were not thereafter used until February, 1961.

At all times, from the time of the installation of the dead men until the time of the accident, Jett had been in possession and control of the dead men and the surrounding premises on which they and the well were located. Had the dead men been installed in the normal and usual manner followed in installing such dead men, they would not have pulled out of the ground and the derrick would not have fallen.

There was evidence that after the well had been completed, in accordance with usual practice, the ground about the well site was leveled, but there was no evidence that such leveling had uncovered or removed four feet of dirt above the pipe to which the cable was attached. The only part of the dead men which could be seen by Beaty was the upper portion of the cables and the loops. There was no evidence that the condition of the cables indicated anything wrong with the dead men or their installation. Prior to the accident there was nothing to indicate that the pipe which pulled out had not been embedded in concrete. The defective installation was latent and concealed below the ground. There was nothing apparent to Beaty which would indicate the defective installation or indicate that Garrett's assurance that they were perfectly good dead men was untrue, or charge Beaty with the duty of making an investigation or tests to determine whether the dead men were properly installed.

Garrett not only offered the use of Jett's dead men to Graham, but insisted that Graham use them in order to save time and expedite the completion of the work over job. After Beaty had made the inquiries hereinbefore set out, he accepted the offer by stating that he would use Jett's dead men. Garrett's offer and its acceptance by Beaty brought into being, as a term of the oral contract, an agreement by Jett to furnish its dead men to Graham to carry out the work it contracted to perform.

The defects in the dead men were the proximate cause of the derrick falling and Cliburn's resulting death. On February 10 and 11, 1961, Garrett knew, or by the exercise of reasonable care could have discovered, that the dead men were in a dangerous and defective condition,

and when he provided the dead men for use by Graham he failed to use proper care and diligence to see that they were in safe and suitable condition for the use to which they were to be put by Graham.

■ A contractee who agrees to furnish his contractor with a particular instrumentality to be used in performing the work contracted for, is liable for injuries to a servant of the contractor, suffered while engaged in carrying out such work, caused by defect in such instrumentality furnished by the contractee, known to him, or which he could have discovered by the exercise of reasonable care.[4]

[2] There is an implied obligation on the part of the contractee who agrees to furnish an instrumentality to carry out the work to use reasonable care to see that the instrumentality is safe and suitable for the purpose.[5]

While the rules, as stated above, are firmly established by many decisions of the American courts,[6] we have found no Alabama decision directly in point.[7] Connors-Weyman Steel Co. v. Kilgore, 189 Ala. 643, 66 So. 609, recognized the rule, but held it inapplicable under the facts in that case. The Alabama court in its opinion said:

"But prima facie out of these conditions and this relationship [that of independent contractor and contractee] no duty is devolved upon the mine owner to furnish any part of the equipment necessary or suitable for the operation of the mine; and more especially is there no duty to select and install such safety appliances * * *. In order to fasten such a duty upon the mine owner (the contractee) it must be made to appear, either that he was bound to do so by agreement with the contractor, or else that he had in fact assumed to do so with the knowledge of the contractor or his employés, and that they had relied upon his doing so."

■ The contractor has a right to rely on the performance by the contractee of such duty to furnish an instrumentality that is safe and suitable for the purpose and is not required to search for hidden defects, absent any visible indication that they exist.[8]

■ The administrator's evidence would have supported findings by the jury that Jett agreed to furnish the dead men to Graham to carry out the job of working over the well, that Jett owed a duty to Cliburn to exercise reasonable care to furnish dead men that were safe and suitable for the purpose furnished, and that it breached that duty and its breach was the proximate cause of Cliburn's death.

We conclude, therefore, that the court erred in directing a verdict for Jett.

Reversed and remanded, with instructions to grant the administrator a new trial.

4. Martin v. Food Machinery Corp., 100 Cal. App.2d 244, 223 P.2d 293, 296; Coughtry v. Globe Woolen Co., 56 N.Y. 124, 126. 127; Mulchey v. Methodist Religious Society, 125 Mass. 487, 488, 489; Jenkins v. Banks, 147 Me. 438, 87 A.2d 908, 910; Note: 44 A.L.R. 1048; Arizona Binghampton Copper Co. v. Dickson, 22 Ariz. 163, 195 P. 538, 540, 541; McCall v. Pacific Mail S.S. Co., 123 Cal. 42, 55 P. 706, 707; Houlihan v. Sulzberger & Sons Co., 282 Ill. 76, 118 N.E. 429, 430; Connors-Weyman Steel Co. v. Kilgore, 189 Ala. 643, 66 So. 609, 611.

5. Jenkins v. Banks, 147 Me. 438, 87 A.2d 908, 910; The Rheola, 2 Cir., 19 F. 926; Note: 44 A.L.R. 1048, et seq.; Mulchey v. Methodist Religious Society, 125 Mass. 487, 488, 489; Roosth & Geneco Production Co. v. White, 152 Tex. 619, 262 S. W.2d 99, 102, 103.

6. Martin v. Food Machinery Corp., 100 Cal.App.2d 244, 223 P.2d 293, 296; Note: 44 A.L.R. 1048, et seq.

7. The accident occurred in Alabama and Alabama law would be controlling.

8. Jenkins v. Banks, 147 Me. 438, 87 A.2d 908, 910.